John P. Aldrich, Esq.
Nevada Bar No. 6877
**ALDRICH LAW FIRM, LTD.**
7866 West Sahara Avenue
Las Vegas, Nevada 89117
Tel: (702) 853-5490
Fax: (702) 227-1975
jaldrich@johnaldrichlawfirm.com

*Attorney for Plaintiff*

[Additional Counsel Listed Below]

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOHN K. GRAY, derivatively on behalf of PAYSIGN, INC., | ) Case No. |
| | ) |
| | ) (Derivative Action) |
| Plaintiff, | ) |
| vs. | ) **VERIFIED STOCKHOLDER** |
| | ) **DERIVATIVE COMPLAINT** |
| MARK ATTINGER, DANIEL HENRY, | ) |
| JOAN M. HERMAN, BRUCE A. MINA, | ) <u>DEMAND FOR JURY TRIAL</u> |
| MARK NEWCOMER, DANIEL SPENCE, | ) |
| DENNIS TRIPLETT, and QUINN | ) |
| WILLIAMS, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| -and- | ) |
| | ) |
| PAYSIGN, INC., | ) |
| a Nevada corporation, | ) |
| | ) |
| Nominal Defendant. | ) |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff John K. Gray ("Plaintiff"), derivatively on behalf of Paysign, Inc. (hereafter "Paysign," or the "Company"), submits this Verified Shareholder Derivative Complaint against certain current and/or former members of Paysign's Board of Directors (the "Board") and senior executive officers (collectively, the "Individual Defendants") for breaches of their fiduciary duties.  Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on the investigation of his counsel, including a review of legal and regulatory filings, press releases, and media reports about Paysign.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

In support of these derivative claims, Plaintiff alleges as follows:

**NATURE OF THE ACTION**

1.      This is a stockholder derivative action to remedy the wrongdoing committed by the Individual Defendants between approximately March of 2019 and the present (the "Relevant Period").

2.      Paysign is a card payment solutions provider and an integrated payment processor based in Henderson, Nevada that services prepaid debit cards sponsored by other companies. On April 23, 2019, the Company changed its name from 3PEA to Paysign. The Company earns revenue from services such as transaction processing, cardholder enrollment, value loading, account management and customer service-related activities.

3.      On four separate occasions during 2019 and early 2020, the Individual Defendants caused the Company to state in both Annual and Quarterly reports filed with the SEC that its Chief Executive Officer ("CEO"), defendant Mark Newcomer ("Newcomer"), and its Chief Financial Officer ("CFO"), defendant Mark Attinger ("Attinger"), personally evaluated the effectiveness of the Company's internal controls over financial reporting, and based on their evaluations, Paysign's internal controls and procedures were effective. Paysign's 2018 Annual Report was signed by defendants Newcomer, Attinger, and Daniel Spence ("Spence"), the Company's Chief Technology Officer ("CTO"). Defendants Newcomer and Attinger also signed

the 2019 Form 10-Q quarterly reports issued by the Company during the Relevant Period that contained similar misrepresentations about the effectiveness of Paysign's internal controls. Defendants Newcomer and Spence are collectively the beneficial owners of 36% of the Company's outstanding shares of common stock.

4.      Unbeknownst to stockholders, however, the Individual Defendants knew or recklessly disregarded numerous facts that put them on notice of material and persistent weaknesses in the Company's internal controls

5.      For example, the Individual Defendants employed an accountant named Arthur De Joya ("De Joya"), even though De Joya was prohibited from practicing as an accountant pursuant to an SEC cease and desist order. The Individual Defendants employed De Joya to work on the preparation of the Company's financial statements for fiscal years 2017, 2018 and 2019.

6.      De Joya was well known to the Individual Defendants because he worked for Paysign for several years, served as its CFO from 2007 to 2015, audited its financial statements as the Company's (purportedly independent) outside auditor, and, according to a confidential witness cited in a related federal securities lawsuit, sat in an office next to Newcomer's and Attinger's offices while working closely with those defendants. It was widely known throughout the Company that De Joya's suspension legally prohibited him from performing certain tasks at Paysign.

7.      De Joya was suspended from practicing or appearing before the SEC because he egregiously ignored the signs of an elaborate fraud associated with the audit of another company, which the SEC found amounted to no audit at all. The SEC's September 2015 cease and desist order against De Joya, entered with De Joya's consent, was posted on the SEC's website in 2015. Moreover, to this day, the Nevada State Board of Accountancy's ("NSBA") website shows that De Joya's accounting firm surrendered its accounting license in December 2015 as a result of the SEC's enforcement action. De Joya himself was subject to a disciplinary action by the NSBA that resulted in the imposition of probation from June 9, 2016 to December 9, 2018, meaning that he could not apply to practice before the SEC until the end of 2018. OTC Markets Group ("OTC

2

Markets") continues to list De Joya as a prohibited accountant. Furthermore, the Individual Defendants have admitted that De Joya's assistance in preparing the Company's financial statements for 2019 was impermissible because he was "barred" from practicing or appearing before the SEC.

8.     On March 16, 2020, the Individual Defendants caused the Company to announce a delay in the filing of its Annual Report for 2019 because of a material weakness in its internal controls over financial reporting and information technology general controls. On this news, the price of Paysign's common stock declined by nearly 17% from its previous day closing price of $5.52 per share to close at $4.59 per share on March 16, 2020. The price of Paysign's common stock declined again to close at $4.42 per share on March 17, 2020, and $4.06 per share on March 18, 2020.

9.     On March 31, 2020, the Individual Defendants caused Paysign to issue a press release announcing that the Company would again postpone its earnings results call scheduled for that same day "to complete its year-end closing procedures." On this news, the price of Paysign's common stock declined by over 22% from its previous day closing price of $5.16 to close at $4.35 per share on April 1, 2020. The price of Paysign's common stock declined again on April 2, 2020 to close at $4.03 per share.

10.     In April 2020, the Individual Defendants caused the Company to disclose that material weaknesses in the Company's internal controls over financial reporting existed as of December 31, 2019, including "lack[ing] sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018, and 2019." As for the information technology general controls, the Individual Defendants admitted that the material weaknesses in internal controls related to software updates.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and

3

misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over all claims under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this district or an individual who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because: (i) nominal defendant Paysign maintains its principal place of business in this district; (ii) one or more of the Defendants resides or maintains offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iv) Defendants have received substantial compensation in this district by doing business here and engaging in

4

numerous activities that had an effect in this district.

**PARTIES**

**A.    Plaintiff**

16.    Plaintiff John K. Gray is a current stockholder of Paysign and has continuously held his Paysign shares at all relevant times.  Plaintiff is a citizen of South Carolina.

**B.    Nominal Defendant**

17.    Nominal Defendant Paysign is a Nevada corporation headquartered at 1700 W. Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89012. From 2006 through April 23, 2019, Paysign was known as 3PEA.   The Company's securities trade on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "PAYS."

**C.    The Individual Defendants**

18.    Defendant Daniel Henry ("Henry") has served as a Paysign director since 2018 and has additionally served as the Chair of the Board's Audit Committee. Upon information and belief, Henry is a citizen of Texas.

19.    Defendant Newcomer is a Paysign co-founder, the Company's CEO, and has served as a director since 2006. Upon information and belief, Newcomer is a citizen of Nevada.

20.    Defendant Spence is a Company co-founder and has served as a director since 2006. Upon information and belief, Spence is a citizen of Australia.

21.    Defendant Bruce Mina ("Mina") has served as a Paysign director since 2018 and has additionally served as a member of the Board's Audit Committee. Upon information and belief, Mina is a citizen of New York.

22.    Defendant Quinn Williams ("Williams") has served as a director since 2018. Upon information and belief, Williams is a citizen of Arizona.

23.    Defendant Joan Herman ("Herman") is the Company's Executive Vice President, Operations, and has served on the Board since 2018. Upon information and belief, Herman is a citizen of Nevada.

24.    Defendant Dennis Triplett ("Triplett") has served as a director since 2018 and has

5

additionally served as a member of the Board's Audit Committee. Upon information and belief, Triplett is a citizen of California.

25.     Defendant Attinger is the Company's former CFO. Upon information and belief, Attinger is a citizen of Arizona.

26.     Defendants Henry, Newcomer, Spence, Mina, Williams, Herman, Triplett and Attinger are referred to herein as the "Individual Defendants".

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

**General Duties as Directors and Officers**

27.     By reason of their positions as Paysign's officers and directors and because of their ability to control Paysign's business and corporate affairs, the Individual Defendants owed Paysign and its stockholders' fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage Paysign in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Paysign and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer defendant owes to Paysign and its stockholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of fair dealing, in the administration of Paysign's affairs and in the use and preservation of its property and assets.

29.     The Individual Defendants, because of their positions of control and authority as directors and officers of Paysign, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the Individual Defendants, as Paysign's officers and directors, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     ensure that Paysign was operated in a diligent, honest, and prudent manner

6

in accordance with its bylaws and charter, as well as the laws and regulations of Nevada and the United States;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of Paysign's business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     fully inform themselves as to how Paysign conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Paysign and procedures for the reporting of the business and internal affairs and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Paysign's operations and financial statements comply with all laws;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

31.     Each Individual Defendant, by virtue of his or her position as a director or officer, owed to the Company and to its stockholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

7

the Company, as well as in the use and preservation of its property and assets.  The Individual Defendants' misconduct complained of herein involves a knowing and culpable violation of their obligations as Paysign's directors and officers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Paysign's Board at all relevant times.

32.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.   The Individual Defendants' conduct in causing the Company to make misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, the Individual Defendants breached their fiduciary duties including their duties of good faith, candor, and loyalty.

33.     At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

**The Duty of Reasonable and Prudent Supervision**

34.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls;

(d)     remain fully informed as to how Paysign conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(e)     ensure that Paysign was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(f)     refrain from breaching their duty of loyalty to the Company to benefit themselves at the expense of the Company.

35.     Paysign also maintains a Code of Ethics, which applies to all employees, officers and directors. In a section titled, "Compliance with Laws and Regulations," the Code of Ethics states the following, in relevant part:

> Employees must comply with all applicable laws and regulations which relate to their activities for and on behalf of Paysign. Paysign will not tolerate any violation of the law or unethical business dealing by any employee, including any payment for, or other participation in, an illegal act, such as bribery.

> Paysign is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for Paysign. Numerous federal, state and local laws and regulations define and establish obligations with which Paysign, its employees and agents must comply. Under

9

certain circumstances, local country law may establish requirements that differ from this code.

36.     In a section titled, "Insider Information and Insider Trading," the Code of Ethics states the following:

Employees may receive information concerning Paysign or one of its affiliates, business partners, clients, or customers that is confidential and not generally known by the public. If that information is "material" (i.e., publication of that information is likely to affect the market price of the stock of the entity to which the information relates), then the employee has an ethical and legal obligation not to (a) act on that information (i.e., buy or sell stock based on that information), (b) disclose that information to others, or (c) advise others to buy or sell the stock of the entity to which that information relates, until such information becomes public. An employee's direct or indirect use of or sharing of such confidential, privileged, or otherwise proprietary business information of Paysign or its partners, clients, or customers for financial gain, including investment by the employee or the transmission of this information to others so that they can use this information for their financial gain, constitutes insider trading, which is a criminal offense. Please refer to Paysign's Insider Trading Policy for more information.

37.     In a section titled, "Paysign's Funds and Property," the Code of Ethics states the following:

Paysign has developed a number of internal controls to safeguard its assets and imposes strict standards to prevent fraud and dishonesty. It is every employee's responsibility to implement, maintain and enhance the effectiveness of the control environment in which they operate. All employees who have access to Paysign's funds in any form must at all times follow prescribed procedures for recording, handling and protecting such funds. Operating areas may implement policies and procedures relating to the safeguarding of Paysign property, including computer software.

Employees must at all times ensure that Paysign's funds and property are used only for legitimate Paysign business purposes. Where an employee requires Paysign funds to be spent, it is the employee's responsibility to use good judgment on Paysign's behalf and to ensure that appropriate value and authorization is received for such expenditure.

All payments made by or on behalf of Paysign for any purpose must be fully and accurately described in the documents and records supporting the payment. No false, improper, or misleading entries shall be made in the books and records of Paysign.

Complete and accurate information is to be given in response to inquiries from Paysign's Audit Committee and certified public accountants.

If employees become aware of any evidence that Paysign funds or property may have been or are likely to be used in a fraudulent or improper manner they should immediately and confidentially advise Paysign as set out in the contravention of the code section of this document. It is Paysign's policy that no

10

retaliation or other adverse action will be taken against any employee for good-faith reports.

38.     In a section titled, "Paysign's Records," the Code of Ethics states the following:

Accurate and reliable records of many kinds are necessary to meet Paysign's legal and financial obligations and to manage the affairs of Paysign.

Paysign's books and records should reflect all business transactions in an accurate and timely manner. Undisclosed or unrecorded revenues, expenses, assets or liabilities are not permissible, and the employees responsible for accounting and record-keeping functions are expected to be diligent in enforcing proper practices.

39.     In a section titled, "Prompt Communications," the Code of Ethics states the following:

Paysign strives to achieve complete, accurate, fair, understandable and timely communications with all parties with whom it conducts business, as well as government authorities and the public. All employees must take all steps necessary to assist Paysign in fulfilling its disclosure responsibilities. In addition, prompt and effective internal communication is encouraged.

A prompt, courteous and accurate response should be made to all reasonable requests for information and other client communications. Any complaints should be dealt with in accordance with internal procedures established by various operating areas of Paysign and applicable laws.

40.     In a section titled, "Media Relations," the Code of Ethics provides that "[a]n employee, when dealing with anyone outside Paysign, including public officials, must take care not to compromise the integrity or damage the reputation of any outside individual, business, or government body, or that of Paysign."

41.     In a section titled, "Obligations of Employees, the Code of Ethics states the following:

It is of paramount importance to Paysign that all disclosure in reports and documents that Paysign files with, or submits to, the SEC, and in other public communications made by Paysign is full, fair, accurate, timely and understandable. You must take all steps available to assist Paysign in fulfilling these responsibilities consistent with your role within the Paysign. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Paysign's preparation of its public reports and disclosure.

All employees must perform their duties diligently, effectively and efficiently, and in particular:

11

a)    support and assist Paysign to fulfill its commercial and ethical obligations and objectives as set out in this Code;

b)    avoid any waste of resources, including time;

c)    be committed to improve productivity, achieve the maximum quality standards, reduce ineffectiveness, and avoid unreasonable disruption of activities at work;

d)    commit to honoring their agreed terms and conditions of employment;

e)    not act in any way that may jeopardize the stockholders' rights to a reasonable return on investment;

f)    act honestly and in good faith at all times and report any harmful activity they observe in the workplace;

g)    recognize fellow employees' rights to freedom of association and not intimidate fellow employees;

h)    pay due regard to environmental, public health and safety conditions in and around the workplace; and

i)    act within their powers and not carry on the business of Paysign recklessly.

42.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to shareholders and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

43.    The Board also maintains a charter for the standing Audit Committee. This charter requires Audit Committee members to do the following:

Review, periodically, issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives,

12

as well as off-balance sheet structures, on the financial statements of the Company.

\*\*\*

Review with management, the independent auditors, and the internal auditors, if any, the adequacy and effectiveness of the Company's internal controls, and the integrity of the Company's financial reporting process.

## FACTUAL ALLEGATIONS

44.     Founded in 2001 under the name "3PEA Technologies, Inc.," Paysign is a provider of prepaid debit card programs and related card processing software and services. In March 2006, the Company completed a reverse-merger with Tika Corporation ("Tika"), a non-operating public company, through which the former 3PEA Technologies, Inc. became a subsidiary of Tika, and the Company rebranded itself as "Paypad, Inc." The Company again changed its name to "3PEA International, Inc." in October 2006, and once more on April 23, 2019 to Paysign, Inc.

45.     Today, the Company markets prepaid debit card programs under its PaySign brand, and issues debit cards in connection with its card programs to various corporate clients in the U.S. and abroad. Additionally, the Company offers a card processing software platform also branded "PaySign" that provides transaction processing, cardholder enrollment, cardholder account management, value loading, and other related services to prepaid card issuers, small and mid-size financial institutions, and other customers.

46.     As a company that operates in the IT business and has a significant component of its business model centered on processing and storing data, Paysign maintains IT general controls over the systems, processes, programs, and data files that make up its IT environment. Such controls include, among other things, controls over access to user accounts, applications, data, and program files, controls over program change management, security controls over the Company's data centers and computer network systems, data backup and recovery controls and procedures, and controls over the general operation of the Company's computer systems and software.

13

47.     Throughout the Relevant Period, the Individual Defendants caused the Company to file annual and periodic reports with the SEC that asserted that the Company had effective disclosure controls and internal controls over financial reporting, and that there were no changes in the effectiveness of the Company's controls from quarter to quarter.

48.     However, as the Individual Defendants would later admit, the Company in fact failed to maintain effective IT general controls or internal controls during the Relevant Period. These control failures would ultimately require the Company to delay the filing of its 2019 10-K, and to twice delay the Company's 2019 year-end earnings releases.

**A.     The Individual Defendants' False and Misleading Statements**

**1.     March 12, 2019 Annual Report**

49.     On March 12, 2019, the Individual Defendants caused the Company to file its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K"). The 2018 10-K was signed by defendants Newcomer, Attinger, Spence, Herman, Henry, Mina, Triplett, and Williams, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

50.     In its discussion of the various risks facing the Company, the 2018 10-K detailed the following risk factors related to the operation of the Company's computer systems and data centers, which failed to include any mention of the Company's deficient IT general controls:

> Our ability to provide reliable service to our clients and cardholders depends on the efficient and uninterrupted operation of our computer network systems and data centers as well as those of our third party service providers. Our business involves movement of large sums of money, processing of large numbers of transactions and management of the data necessary to do both. Our success depends upon the efficient and error-free handling of the money. We rely on the ability of our employees, systems and processes and those of the banks that issue

14

our cards, our third party service providers to process and facilitate these transactions in an efficient, uninterrupted and error-free manner.

In the event of a breakdown, a catastrophic event (such as fire, natural disaster, power loss, telecommunications failure or physical break-in), a security breach or malicious attack, an improper operation or any other event impacting our systems or processes, or those of our vendors, or an improper action by our employees, agents or third-party vendors, we could suffer financial loss, loss of customers, regulatory sanctions and damage to our reputation. The measures we have taken, including the implementation of disaster recovery plans and redundant computer systems, may not be successful, and we may experience other problems unrelated to system failures. We may also experience software defects, development delays and installation difficulties, any of which could harm our business and reputation and expose us to potential liability and increased operating expenses. We currently do not carry business interruption insurance.

51.   With respect to the Company's internal controls, the 2018 10-K stated the following, in relevant part:

Mark Newcomer, our chief executive officer, and Mark Attinger, our chief financial officer, are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2018. Based on that evaluation, our chief executive officer and chief financial officer concluded that, as of the evaluation date, such controls and procedures were effective.

* * *

There were no changes in our internal controls over financial reporting that occurred during the year ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

* * *

As of December 31, 2018 we conducted an evaluation, under the supervision and with the participation of our chief executive officer (our principal executive officer), our chief operating officer and our chief financial officer (also our principal financial and accounting officer) of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control -

15

Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, or the COSO Framework. Management's assessment included an evaluation of the design of our internal control over financial reporting and testing of the operational effectiveness of those controls.

A material weakness is defined within the Public Company Accounting Oversight Board's Auditing Standard No. 5 as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***Based upon this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2018.***

(Emphasis added.)

### 2. May 8, 2019 Form 10-Q

52. On May 8, 2019, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by defendants Newcomer and Attinger, and contained SOX certifications signed by defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

53. With respect to the Company's internal controls, the IQ19 10-Q stated the following, in relevant part:

Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of March 31, 2019. Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.

\* \* \*

16

There were no changes in our internal controls over financial reporting that occurred during the quarter ended March 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### 3.    August 7, 2019 Form 10-Q

54.    On August 7, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by defendants Newcomer and Attinger, and contained SOX certifications signed by defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

55.    With respect to the Company's internal controls, the 2Q19 10-Q stated the following, in relevant part:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of June 30, 2019. Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.
>
> * * *
>
> There were no changes in our internal controls over financial reporting that occurred during the quarter ended June 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### 4.    November 6, 2019 Form 10-Q

56.    On November 6, 2019, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2019 (the

17

"3Q19 10-Q"). The 3Q19 10-Q was signed by defendants Newcomer and Attinger, and contained SOX certifications signed by defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

57.   With respect to the Company's internal controls, the 3Q19 10-Q stated the following, in relevant part:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of September 30, 2019. Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.

*   *   *

> There were no changes in our internal controls over financial reporting that occurred during the quarter ended September 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**B.     The Truth Emerges**

58.   On March 16, 2020, the Individual Defendants caused the Company to issue a press release revealing that management had discovered material weaknesses related to the Company's internal controls and the Company's IT general controls. As a result, and in order to provide the Company with enough time to complete its financial audit, the Company would be forced to delay the filing of the 2019 10-K. The press release stated the following, in relevant part:

18

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

[Paysign], a vertically integrated provider of innovative prepaid card programs, digital banking and processing services for corporate, consumer and government applications, announced today that it will be delayed in the filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2019. Paysign is filing a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission, which will provide Paysign with a 15 calendar-day extension beyond the March 16, 2020 deadline within which to file the annual report on Form 10-K. The filing extension will provide the necessary time to complete the financial audit.

For the full year 2019, total revenues are expected to be $34.7 million, an increase of 48% when compared to 2018. Net income attributable to Paysign on a GAAP basis is expected to be $7.5 million, an increase of 188% when compared to 2018, and Adjusted EBITDA is expected to be $IO.I Million, an increase of 106% when compared to 2018.

These are preliminary results and estimates based on current expectations and are subject to completion of the financial audit. Actual results may differ materially. Paysign expects to finalize its financial results and file its Annual Report on Form 10-K no later than the prescribed due date allowed pursuant to Rule 12b-25.

Separately, in the course of completing its assessment of internal controls over financial reporting for 2019 and the company's initial year of compliance with Sarbanes-Oxley 404b, management identified material weaknesses related to (i) assessment of internal controls over financial reporting and (ii) information technology general controls.

59.     On this news, the price of the Company's stock dropped from $5.52 per share at the close of trading on March 13, 2020, the prior trading day, to $4.59 per share at the close of trading on March 16, 2020, representing a loss in value of roughly 16.8%.

60.     On March 30, 2020, the Individual Defendants announced that the Company was forced to delay its year-end earnings call, previously scheduled for March 25, 2020, to March 31, 2020. Then, on April 1, 2020, the Individual Defendants disclosed that the Company would again have to postpone its year-end earnings call to allow for "additional time to complete its year-end closing procedures."

61.     On this news, the price of the Company's stock dropped from $5.16 per share at the close of trading on March 31, 2020, to $4.35 per share at the close of trading on April 1, 2020, representing a loss in value of roughly 16%.

62.     On April 3, 2020, the Individual Defendants issued a press release revealing that NASDAQ authorities had sent a notice to the Company indicating that due to the Company's

19

failure to timely file the 2019 10-K, the Company was no longer in compliance with NASDAQ

Listing Rule 5250(c)(1), which mandates the timely filing of periodic reports with the SEC.

63.    The Company's 2019 10-K was ultimately filed on April 3, 2020. The 2019 10-K

stated that the Company had determined that its internal controls were not effective as of

December 31, 2019, and further indicated that in addition to the material weaknesses previously

disclosed on March 16, 2020, the Company's auditors had noted a third material weakness in the

Company's disclosure controls related to the Company's past employment of a part-time

employee. The 2019 10-K stated the following, in relevant part:

> We have identified control deficiencies that constitute material weaknesses
> relating to: (i) management assessment of internal control over financial
> reporting and (ii) design, implementation and monitoring of information
> technology general controls. ***Additionally, a third material weakness cited by
> the auditors was that the Company lacked sufficient monitoring and
> disclosure controls when employing a part-time employee.***
>
> * * *
>
> As a result of these material weaknesses, our management concluded that our
> internal control over financial reporting were not effective as of December 31,
> 2019. Material weaknesses not remediated may adversely affect our ability to
> report our financial condition and results of operations in a timely and accurate
> manner, decrease investor confidence in our Company, and reduce the value of
> our common stock.
>
> * * *
>
> Material weaknesses included the management assessment of internal control
> over financial reporting, and ineffective oversight of information technology
> general controls pertaining to user access and the Company's systems change
> management. During quarter 4 of 2019 and continuing in 2020, management
> has taken steps to i) improve the design and methods for testing internal
> controls, ii) added resources to carry out such practices, and iii) instituted new
> procedures for managing system user access and change control. Additionally,
> a third material weakness cited by the auditors was that the Company lacked
> sufficient monitoring and disclosure controls when employing a part-time
> employee.
>
> (Emphasis added.)

### INSIDER STOCK SALES

64.    During the Relevant Period, certain of the Individual Defendants collectively sold

more than ***$5.7 million*** worth of Company stock. The particulars of those transactions are detailed

20

in the chart below:

| Insider | Sale Date | Shares | Price | Total |
|---------|-----------|--------|-------|-------|
| Mark Newcomer | 4/18/19 | 35,000 | $8.43 | $295,050 |
| Mark Newcomer | 9/18/19 | 200,000 | $11.03 | $2,206,000 |
| Daniel Henry | 9/20/19 | 2,572 | $11.21 | $28,832 |
| Daniel Henry | 9/25/19 | 15,408 | $11.01 | $169,664 |
| Daniel Spence | 9/25/19 | 23,781 | $11.01 | $261,860 |
| Daniel Spence | 10/4/19 | 96,219 | $11.20 | $1,077,264 |
| Daniel Henry | 10/4/19 | 132,020 | $11.40 | $1,505,083 |
| Quinn Williams | 10/30/19 | 15,000 | $10.94 | $164,100 |
| **Total:** | | **520,000** | | **$5,707,853** |

65.     These four members of the Board took this opportunity to sell artificially inflated shares of Company stock before the truth emerged. These directors stood to lose *millions of dollars* had they waited to sell their Paysign stock until after the truth was disclosed regarding the serious and systemic problems facing Paysign.

66.     It appears that these insiders utilized their inside knowledge of the Company's problems to avoid the resulting stock decline. This conclusion is buttressed by the fact that none of defendants Newcomer, Henry, Spence or Williams (who themselves constitute a four-person majority of the Board), sold any stock in the previous two calendar years. Similarly, no Individual Defendant, nor in fact did any named reporting officer, sell any Paysign stock in calendar 2020. It wasn't until March 2021 that any senior officer or director sold Paysign stock. Thus, it is reasonable to infer that the abnormal trading pattern which occurred for just five months during 2019 and immediately preceding the Company's disclosure of pervasive internal control problems was designed by the selling defendants to utilize their inside knowledge for profit.

**DAMAGES TO PAYSIGN**

67.     Paysign has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

68.     As a direct and proximate result of the Individual Defendants' conduct, Paysign has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

21

(a)     legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws;

(b)     loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(c)     amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigation conducted by Paysign into the internal control failings; and

(d)     loss of revenues and profits due to any subsequent restatements.

## DERIVATIVE ALLEGATIONS

69.     Plaintiff brings this action for the benefit of Paysign to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

70.     Paysign is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

71.     Plaintiff is and has been a Paysign stockholder during the Relevant Period and will adequately and fairly represent the interests of Paysign in enforcing and prosecuting its rights.

72.     Paysign's Board at the time this action was initiated consisted of the following seven directors: defendants Henry, Newcomer, Spence, Mina, Williams, Herman, and Triplett. Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

73.     Where the board consists of seven directors, plaintiff need only adequately allege that four of the directors lack independence or face a substantial likelihood of liability to establish that a demand on the board would be futile.  As shown below, pre-suit demand in this case would be futile because at least four of the current Board members lack independence and/or face a

22

substantial likelihood of liability.

### A. Demand Is Futile Because a Majority of the Director Defendants Lack Independence and/or Face a Substantial Likelihood of Personal Liability

#### 1. Defendants Newcomer, Spence, and Herman Lack Independence

74.     Demand is futile as to Newcomer, Spence, and Herman each of whom lack independence due to their positions as senior executive officers at Paysign. Defendant Newcomer currently serves as Paysign's CEO and did so during the Relevant Period. Defendant Spence is a Company co-founder and has served as a director since 2006. Defendant Herman is the Company's Executive Vice President, Operations and has served in that role since approximately 2017. Each of defendants Newcomer, Spence and Herman has earned and stands to earn millions of dollars in compensation due to their executive positions with Paysign. Paysign's most recent Proxy Statement confirms that the Board itself considers these three directors to lack independence.

75.     Accordingly, defendants Newcomer, Spence, and Herman are incapable of independently considering a demand to commence and vigorously prosecute this action against those defendants who control their annual compensation.

#### 2. Defendants Newcomer, Spence, Henry, and Williams Face a Substantial Likelihood of Liability Due to Their Illicit Insider Trading Profits

76.     Defendants Newcomer, Spence, Henry, and Williams each face a substantial likelihood of liability for the insider trading alleged herein. During the Relevant Period, while possessing material, adverse, non-public information regarding the Company's internal control failures, defendants Newcomer, Spence, Henry and Williams collectively sold 520,000 shares of Paysign common stock for proceeds of more than $5.7 million.  If these sales had been made at prices prevailing after the inflation was removed from Paysign's stock price, the proceeds from these sales would have been reduced up to 50%.  By comparison, before these sales, none of these defendants had sold even a single share of Company stock during the previous two calendar years.  As such, defendants Newcomer, Spence, Henry and Williams are interested for purposes

23

of demand.

### 3.   Every Director Who Signed a False and Misleading SEC Filing Faces a Substantial Likelihood of Personal Liability, Excusing Demand

77.   The entire Board has demonstrated its inability to act in compliance with its fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein.  Every Board member has acted in violation of their fiduciary duties to the Company's stockholders, as described herein.

78.   For example, defendants Newcomer, Spence, Herman, Henry, Mina, Triplett and Williams approved and signed the Company's SEC filings that contained false and misleading statements, including the Form 10-K dated March 12, 2019. Therefore, no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith and, accordingly, demand is excused.

### 4.   The Board's Audit Committee Members Face a Substantial Likelihood of Personal Liability, Excusing Demand

79.   Defendants Henry, Mina and Triplett are members of the Audit Committee and therefore were duty-bound to remain sufficiently informed about the Company's accounting procedures and its internal controls at all times, and yet just as clearly they each disregarded such duties. Defendants Henry, Mina and Triplett have each failed to comply with their obligations pursuant to the Audit Committee Charter, which, among other things, required them to:

> Review, periodically, issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

80.   As such, Defendants Henry, Mina and Triplett are incapable of disinterestedly and

24

independently considering a demand to commence and vigorously prosecute this action.

**5.      Newcomer and Spence Are Named Defendants in the Related Federal Securities Class Action and Face a Substantial Likelihood of Personal Liability, Excusing Demand**

81.      Defendants Newcomer and Spence are named individual defendants in the federal securities class action lawsuit captioned *In re Paysign, Inc. Securities Litigation*. Case No. 20-cv-005530GMN-DJ, pending in the United States District Court for the District of Nevada (the "Securities Action"). The Securities Action alleges that these defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 by making various untrue statements of material fact in the SEC filings cited herein. As such, Newcomer and Spence each face a substantial likelihood of personal liability for their misconduct giving rise to the Securities Action, rendering demand against them futile here in this lawsuit.

## COUNT I

### For Breaches of Fiduciary Duties

### Against All Individual Defendants

82.      Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

83.      Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Paysign's business and affairs, particularly with respect to issues regarding the Company's compliance with laws.

84.      Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, and loyalty.

85.      The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Paysign.

86.      In breach of their fiduciary duties owed to Paysign, the Individual Defendants

25

willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee Paysign's business, rendering them personally liable to the Company for breaching their fiduciary duties.

87. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations and omissions of the material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly.

88. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

89. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Paysign has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### For Breaches of Fiduciary Duties

**Against Defendants Newcomer, Spence, Henry, and Williams for Insider Trading**

90. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though full set forth herein.

91. Defendants Newcomer, Spence, Henry and Williams by virtue of their positions and relationships with Paysign, had access, directly or indirectly, to material information about Paysign that was not generally available to the public, as described above.

92. The information described above was a proprietary asset belonging to the Company, which defendants Newcomer, Spence, Henry and Williams used for their own benefit when they sold Paysign common stock.

93. These defendants' sales of Paysign common stock while in possession and control

26

of the proprietary, non-public information described above were breaches of their fiduciary duty of loyalty.

94.     Because the use of the Company's proprietary information for their own gain constitutes a non-exculpated breach of the defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendants Newcomer, Spence, Henry and Williams obtained thereby.

## COUNT III

### For Unjust Enrichment Against All Individual Defendants

95.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

96.     By their wrongful acts and omissions each of the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Paysign.

97.     During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from Paysign that was tied to the financial performance of Paysign or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

98.     Plaintiff, as a stockholder and representative of Paysign, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits (including the approximately $5.5 million in profits obtained by defendants Newcomer, Spence, Henry and Williams from insider trading), benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Paysign and that

27

Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Paysign;

C.     Determining and awarding to Paysign the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.     Directing Paysign and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Paysign and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(1)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

(2)     a provision to permit the stockholders of Paysign to nominate at least one new candidate for election to the Board;

(3)     a proposal to strengthen the Board's supervision of the Company's CEO and CFO;

(4)     a provision to appropriately test and then strengthen the internal audit and control functions; and

(5)     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E.     Awarding Paysign restitution from the Individual Defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

28

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Date: May 9, 2022                                      Respectfully submitted,

**ALDRICH LAW FIRM, LTD.**

/s/ John P. Aldrich
John P. Aldrich, Esq.
Nevada Bar No. 6877
7866 West Sahara Avenue
Las Vegas, Nevada 89117
Tel: (702) 853-5490
Fax: (702) 227-1975
jaldrich@johnaldrichlawfirm.com

**SHUMAN, GLENN & STECKER**
Kip B. Shuman
100 Pine Street, Ste. 1250
San Francisco, CA 94111
(303) 861-3003

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003

**KASKELA LAW LLC**
Seamus Kaskela
Adrienne Bell
18 Campus Blvd. Ste. 100
Newtown Square, PA 19073
(888) 715-1740

*Plaintiff's Counsel*

29

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT